Teegarden *et ux. v.* Lewis, Administrator.

---

Teegarden et ux. *v.* Lewis, Administrator.

[No. 16,698.    Filed June 4, 1895.    Rehearing denied May 15, 1896 ]

Gift.—*Special Verdict.—Mental Capacity of Donor.—Practice.*—On the issue as to whether a donor had sufficient mental capacity to make a valid gift *inter vivos*, a finding in a special verdict that the

Teegarden *et ux. v.* Lewis, Administrator.

donor was of unsound mind, is a mere conclusion of law and not such a statement of facts as that the court could apply the proper legal conclusions and render judgment.  *p. 99,*

SAME.—*Unsoundness of Mind.—Burden of Proof.*—One who challenges the mental capacity of a testator, or donor, has the burden of establishing the absence of the particular capacity in issue. *p. 102.*

PRACTICE.—*Fiduciary.—Burden of Proof.*—One occupying a fiduciary relation must, when the question is made, establish his right in equity and good conscience to any advantage gained by him from or through his principal, or his principal's business.  *p. 112.*

SAME.—*Parent and Child.—Presumption of Fraud.—Onus of Proof.*—The relation of parent and child, as to presumption of fraud and the *onus* of proof to rebut the same, in business transactions between them, does not stand upon the same footing as the relation of trustee and *cestui que trust,* guardian and ward and the like relations. *p. 116.*

From the Parke Circuit Court. *Affirmed in part and Reversed in part.*

*Rice & Johnson,* and *McCabe & Bingham,* for appellants.

*W. T. Whittington,* and *Kennedy & Kennedy,* for appellee.

HACKNEY, J.—The question for decision in this case arises upon a special verdict, and involves the right of the appellants to retain, as against the appellee, moneys held by them as gifts from the appellee's intestate.

It was found that the appellants, jointly, had received $4,774.00, and that said John R. Teegarden had received to his separate use $4,093.00. In each instance, where it is found that the appellants received money from the intestate, it is also found that the intestate "was of unsound mind." For the appellants, it is insisted that the special verdict, in finding that the intestate "was of unsound mind," stated a conclusion of law, or of mixed law and facts, and failed to state the ultimate facts, upon which the court could apply the proper legal conclusions and render judg-

ment. For the appellee, it is contended that the finding quoted is a finding of the ultimate facts only. There is little, if any, room to doubt that if the intestate did not possess mental capacity sufficient either to execute a valid will or a valid contract, the gifts were voidable and the appellants must be held to have received the moneys to the use and benefit of the intestate, and that it may be recovered by the appellee. *Jenners* v. *Howard, Admr.*, 6 Blackf. 240; *McQueen* v. *Bank*, 2 Ind. 413; *Ferguson* v. *Dunn's Admr.*, 28 Ind. 58; *Musselman* v. *Cravens*, 47 Ind. 1; *McFadden* v. *Wilson*, 96 Ind. 253; *Moore* v. *Shields*, 121 Ind. 267; *Bullard* v. *Hascall*, 25 Mich. 132; *Mason* v. *Waite*, 17 Mass. 560.

Some authorities hold that the test of mental capacity to be applied to a completed gift is the same as that to be applied to any other contract, and not that of testamentary capacity. 2 Schouler Per. Prop., sections 59, 141; 8 Am. and Eng. Ency. of Law, 1309. The reason given for this rule is that there are necessarily two parties, and the transaction involves the assent of two minds, while in the execution of a will there is but one active party, with opportunity for reflection apart from the beneficiary and free from his influences. A gift *inter vivos* differs from a bestowal by will, only as it does from gifts *causa mortis*, it is not made in contemplation of or to be effective upon the death of the donor. If inducements or influences, from the donee, to make the gift, should be considered in determining the test of mental capacity, we are unable to discern why the same inducements and influences might not obtain in the execution of a will as of a gift. Either is like the other, in that the donor receives no recompense or equivalent for that which he gives. We do not deny that when completed, the effects of the gift are the same as if the object had been

parted with by contract.    Yet the effect is no less so
when possession is reached through the provisions of
a will.    Why the standard of intellect in either should
be higher than the other, has not been demonstrated.
With deference to the authorities cited, it is our judg-
ment that the capacity to execute a will is the perfect
requisite for the execution of a gift *inter vivos.*

However, we may test the present verdict by either
rule and the same results must be reached, as we view
the question.    The mental requisites for the support
of ordinary contracts have not been so frequently or
so clearly defined as those for the execution of testa-
mentary provisions, yet there is an undoubted dis-
tinction which has been recognized by the holdings
in this State.    In ordinary contracts the test is, were
the mental faculties so deficient or impaired that there
was not sufficient power to comprehend the subject
of the contract, its nature and its probable conse-
quences, and to act with discretion in relation thereto,
or with relation to the ordinary affairs of life.    *Somers*
v. *Pumphrey,* 24 Ind. 231;    *Darnell* v. *Rowland,* 30
Ind. 342;    *Dennett* v. *Dennett,* Ewell's Lead. Cas. 547 N.
558, and Clark Cont. p. 263.

Testamentary capacity is determined upon the in-
quiry:    Did the testator possess sufficient strength of
mind and memory to know the extent and value of his
property, the number and names of those who were
the natural objects of his bounty, their deserts with
reference to their conduct and treatment towards him,
their capacity and necessity, and did he have sufficient
active memory to retain all these facts in mind long
enough to have his will prepared and executed?    *Burk-
hart* v. *Gladdish,* 123 Ind. 337; *Harrison* v. *Bishop,*
131 Ind. 161;    *Fiscus* v. *Turner,* 125 Ind. 46;    *Lowder*
v. *Lowder,* 58 Ind. 538.

We do not so much seek to ascertain the existing distinction and to define it, as to establish the conclusion that mental capacity is susceptible of ascertainment and expression as a fact, unembarrassed by legal conclusions. Whatever the test, we think it clear that its existence, or non-existence, may be found and stated as a question of fact. That special verdicts should find the facts, and should not state conclusions of law, is not doubted or questioned, but the contention here, as we have said, is as to whether the finding that the intestate "was of unsound mind" is a statement of fact, or involves a conclusion of law, and invades the province of the court. Our statute, R. S. 1894, section 2726 (R. S. 1881, section 2556), withholds from persons of unsound mind the power to make a testamentary disposition of property, while it is provided by section 2724, R. S. 1894 (section 2554, R. S. 1881), that "Every contract, sale or conveyance, of any person while of unsound mind, shall be void." By judicial construction, the latter section has been held to mean that such contracts shall be void, if executed by those adjudged to be of unsound mind, and voidable only, if executed by those who are unsound but not so adjudged. *Boyer* v. *Berryman,* 123 Ind. 451; *Copenrath* v. *Kienby,* 83 Ind. 18; *Fay* v. *Burditt,* 81 Ind. 433; *McClain, Gdn.,* v. *Davis,* 77 Ind. 419; *Freed* v. *Brown,* 55 Ind. 310; *Nichol* v. *Thomas,* 53 Ind. 42; *Somers* v. *Pumphrey, supra; Musselman* v. *Cravens, supra; Redden* v. *Baker, Gdn.,* 86 Ind. 191; *Davis* v. *Scott,* 34 Ind. 67.

By section 2714, R. S. 1894 (section 2544, R. S. 1881), the phrase "unsound mind," it is declared, "shall be taken to mean any idiot, *non compos,* lunatic, monomaniac, or distracted person." Yet, it has been settled that one who is of unsound mind, suffering from delusions or being a monomaniac, may make a valid

contract or a will, if such malady do not enter into or control, to some extent, the execution thereof. *Wray* v. *Wray*, 32 Ind. 126; *Durham* v. *Smith*, 120* Ind. 463; *Burkhart* v. *Gladdish*, *supra; Harrison* v. *Bishop*, *supra; Lowder* v. *Lowder*, *supra; Kenworthy* v. *Williams*, 5 Ind. 375; Clark Cont., p. 266.

In *Wray* v. *Wray*, *supra*, the lower court instructed the jury that "it is not necessary to prove the grantor totally insane, that is, of unsound mind as to all subjects; a man may be sane upon some subjects, and of unsound mind upon others. He may be sane upon all other subjects, and yet afflicted with a delusion upon one which would amount to insanity as to that one." This court said of that instruction: "One who seeks to set aside a contract on the ground of insanity must show that it was the offspring of mental disease," and held the instruction to have been correct.

In *Durham* v. *Smith*, *supra*, an instruction was as follows: "Furthermore, I instruct you that a person who is of unsound mind is incapable of making a valid will, and if there is unsoundness of mind, it is not necessary for the contestant to show that such unsoundness had anything to do with the manner of disposing of the property. In such a case the will is invalid, whether it is shown that the unsoundness of mind had, or had not, affected the character of the testament." The instruction was condemned, upon the last proposition therein stated, and it was held that the words "unsound mind," used in the instruction, were used "in their broadest sense, including every species of defectiveness and impairment of the mind." It was said, further, of the instruction: "In short, this charge recognizes but two conditions of the human mind, one sound and capable of doing all acts, and the other unsound and incapable of doing any act; that a person is responsible for all his acts, or not re-

sponsible for any of his acts. This is an erroneous
theory of the law. *Trumbull* v. *Gibbons*, 51 Am. Dec.
253; *Clark* v. *Fisher*, 19 Am. Dec. 402; *Jackson* v.
*King*, 15 Am. Dec. 354, and note. 363."

Some of the cases speak of that defective or impaired condition of mind, which will not avoid a will
or contract, as partial unsoundness of mind. Such
partial unsoundness of mind, as recognized by the law
and as stated in the cases we have cited, if it enter
into and control the execution of the will or contract
so that the will or the contract may be said to be the
offspring of such imperfect or impaired condition, will
be held, under the statutes quoted above, to invalidate
such will or contract. In other words, partial insanity
is an unsoundness of mind which is within the statutory declaration, if it controls the execution of the
contract against the rational will and judgment of the
party. If it do not so control, while nevertheless the
condition is that of unsound mind, the instrument
or act is valid. We are lead, therefore, to the
conclusion that the jury might, under the evidence,
have returned the finding they did, and with good
faith and accurate judgment have found the intestate
to have possessed testamentary capacity, or the ability to make a valid contract upon the tests we have
stated. Such a conclusion is made possible by the
rule that unsoundness of mind may exist, and yet not
affect the testament or the contract. If we should
consider the question with no other lights before us,
it would be seen that such a verdict leaves the court,
whose exclusive office it is to pronounce judgment, in
darkness as to whether the unsoundness of mind
found, is that which enforces the legal conclusion that
the transaction in question is valid or voidable. We
have no doubt, however, that the ultimate fact is not
stated in the verdict. If it had been returned, that the

intestate, at the times in question, was so impaired in
mind that he could not act with discretion in relation
to the ordinary affairs of life; or that from such im-
pairment, he had not the power to comprehend the
subject of the contract, its nature and probable con-
sequences, and to act with discretion in relation
thereto; or that he was unable to know the extent and
value of his property, the number and names of those
who were the natural objects of his bounty, their de-
serts with reference to their conduct and treatment
towards him, their capacity and necessity, and had
not sufficient active memory to retain such facts in
mind long enough to have a will prepared and ex-
ecuted, we would then have a statement of the ulti-
mate facts. Upon such a finding, the courts could
apply the law and direct a judgment.

That the facts indicated are such as should be re-
turned, is we think, very clearly illustrated by apply-
ing the rule necessarily adopted by the trial court in
its charge to the jury, in a case where a general ver-
dict is to be returned. There the court would group
one or more such sets of facts and direct the jury that,
in the event of the evidence establishing such facts,
it would be their duty to return a verdict in favor of
the party asserting the unsoundness of mind. That
such facts are not merely evidentiary, is made plain
by rule that the court would not be permitted to
apply the evidence for the jury, in delivering instruc-
tions. It is made plain, from the further rule, that a
witness could not be permitted to state, as evidence,
any one of the facts so suggested. The witness might
give instances from his observations of the person
whose mind was in question, and he might be per-
mitted to state his opinion, as an expert or as a non-
expert, upon the soundness or unsoundness of such
mind, but, in that event, the jury would be the judge

of the degree of unsoundness. *Hamrick* v. *State, ex rel.,* 134 Ind. 324. If a general verdict were pronounced, it would be upon finding the degree of unsoundness and applying the law as charged, concerning the degree essential to the validity of the instrument. If a special verdict were required, the degree of unsound-ness only would be returned, and the court would apply the rules, otherwise charged to the jury, and determine whether such degree of unsoundness was within the measure of the law, which required the contract or will to be set aside.

In the case of *Perkins* v. *Hayward,* 124 Ind. 445, was laid down a rule for determining when the return is a conclusion or the statement of an ultimate fact. When it is not possible to do more than state the con-clusion, without violating the rule forbidding the statement of evidentiary facts, such conclusion may be stated as of necessity. When there is no standard by which it may be determined, as a pure matter of law, what facts will establish the issue, the inferential fact or conclusion is necessary to come from the jury.

In *Todd* v. *Fenton,* 66 Ind. 25, a will was contested upon the issues of unsoundness of mind, undue ex-ecution, duress, fraud, and undue influence. The court refused interrogatories asked by the defendants and substituted the following; the answers to which we copy:

"Was Elizabeth Todd of sound mind, at the date of the execution of the paper writing in contest, namely, on the 19th day of July, 1869?

"Ans.    She was of unsound mind.

"2.    Was the paper writing duly executed?

"Ans.    It was duly executed.

"3.    Was Elizabeth Todd under duress, at the time she signed the paper writing?

"Ans.    She was not.

"4.  Was said paper writing procured to be made by said Elizabeth Todd, by fraud?

"Ans.  It was.

"5.  Was the paper writing procured to be made by Elizabeth Todd, by undue influence?  If so, by whom?

"Ans.  It was; by Joseph Todd and I. N. Todd."

The court said of the interrogatories:  "They were no more particular than if the court had directed the jury to say whether they found for the plaintiff or the defendants, on each of the several grounds of contest * * *.  To state the matter a little differently, the effect of the interrogatories was simply to require the jury to specify whether or not each of the several grounds of contest was made out."  It was held that such interrogatories and answers were not findings, "upon particular questions of fact to be stated in writing," as the statute required.  One of the rejected interrogatories, which this court held should have been given, was as follows:  "At the time said Elizabeth Todd signed said will, did she have mind and memory sufficient to understand the ordinary affairs of life, and to act with discretion therein?  Did she know her children and grandchildren, and have a general knowledge of the estate of which she was possessed?"  This court said of the interrogatory:  "It was directed to matters of fact concerning which evidence had been given, and not to matters of evidence," and it was held that such facts were the proper subjects of inquiry.  So we may say in the present case, that to find that the intestate was of unsound mind is not only, in effect, but a general verdict, but deprives the court of its prerogative and denies its right to pass upon the legal sufficiency of the facts.  It has been held, in numerous cases, that the *quantum* of mental capacity requisite to the performance of a valid act

is a mixed question of law and fact. *Farrell's Admr.* v. *Brennan's Admx.*, 32 Mo. 328; *Runyan* v. *Price*, 15 Ohio St. 1; *DeWitt* v. *Barley*, 17 N. Y. 340; *Gibson* v. *Gibson*, 9 Yerg. 329; *Henerick* v. *State, etc., supra;* Buswell Insanity, 174.

Without decisions this question is so manifest as to admit of no doubt. It is therefore not for the jury to return the legal conclusion in a special verdict, and it has performed its whole duty in returning the facts whereon the court may pronounce the law.

That a complaint may be sufficient which alleges unsoundness of mind generally, is not at variance with our conclusion, has been held in cases of negligence, conversion, former adjudication, etc. *Conner* v. *Citizens' etc., R. W. Co.*, 105 Ind. 62; *Pittsburg, etc., R. W. Co.* v. *Spencer*, 98 Ind. 186; *Louisville, etc., R. W. Co.* v. *Balch*, 105 Ind. 93; *Nickless* v. *Pearson*, 126 Ind. 477.

There are other questions in the record as to the burden of proof and the form of the judgment, but these will probably not again arise.

In our judgment, the ends of justice will be best subserved by a new trial of the issue between the parties, rather than by ordering judgment on the special verdict. For the error above found, the judgment of the circuit court is reversed, with instructions to grant the appellants' motion for a *venire de novo.*

McCabe, J., did not participate in this case.

On Petition for Rehearing.

Hackney, C. J.—Counsel for the appellee again insist that the finding that Deer was, at the times in question, of "unsound mind," was a finding of fact, and not a conclusion.

We have carefully considered the argument made, and are constrained to adhere to our original holding upon that question. It is urged, also, that when insanity was found, the burden rested upon the appellants to prove that it did not affect the gift, and that since the special verdict omits a finding that such proof was made, the failure in this respect will be deemed the failure of the appellants. This position, at one time, had apparent support from the decisions of this court, but at this time the rule deemed to be just and to be best supported by authority, is that one who challenges the mental capacity of a testator or donor, has the burden of establishing the absence of the particular capacity in issue. *Blough* v. *Parry,* 144 Ind. 463.

There were three paragraphs in the complaint. The first sought to recover for moneys had and received by the appellants to the use of the decedent, Urial Deer. The second alleged, that Deer was of unsound mind; that the appellants had taken charge of his affairs and had collected large sums of money from divers persons and banks for him, and which they concealed and appropriated to their own use. The third paragraph alleged, that Deer was aged and infirm; that he lived with the appellants, his daughter and son-in-law, and was easily controlled and influenced by them; and that they "unduly importuned, persuaded, and influenced said decedent to turn over to them all his money which he then had in his possession, amounting," etc., "which said decedent gave into their possession under the influence of such undue persuasion and importunity," and they have retained the same and refuse to account therefor.

The theory of each paragraph is manifest. By the first, regardless of the mental capacity of Deer, the appellants are charged with money had and received to his use. By the second, with money belonging to

him and obtained by them from his debtors while he was of unsound mind and incapable of consenting to their possession of such money. By the third, the obtaining of his money by undue influence. The jury found, as relating to these several paragraphs, that "Urial Deer had been a person of unsound mind continuously for two years prior to his death, and that in January 1888, the defendants, John R. Teegarden and Hulda Teegarden, his wife, received from said Deer, as a gift, while he was of unsound mind, the sum of $3,850.00, which they yet hold and refuse to pay to plaintiff as administrator," etc. "And further find, that afterwards, and while said Deer was of unsound mind, John R. Teegarden, as agent of Deer, received from," a bank named, "$3,400.00, which sum he wrongfully appropriated to his own use before the commencement of this suit,"etc. "4. We further find that from August, 1887, to the 22d day of August, 1889, the time of Urial Deer's death, he was old, weak, and childish, and relied upon John R. Teegarden to go with him and assist him in transacting all of his financial business; that during all of said period said Deer lived with said John R. Teegarden and the wife of said Teegarden, who was the daughter of said Urial Deer, and that said Deer, during all of said period, was dependent upon said Teegarden and his (Teegarden's) wife for personal care and attention, and a home to live in, and that all of the money hereinbefore found to have been procured from said Deer by them, or given to them by said Deer, has remained in their possession, as hereinbefore found, and that said defendants have not shown that they rightfully received said money from said Urial Deer, and we find that they wrongfully converted all of said money to their own use before the commencement of this suit."

Upon demand, John R. Teegarden denied having

Teegarden *et ux. v.* Lewis, Administrator.

"in his possession any of the personal property of Urial Deer." It was found, also, that when John R. Teegarden obtained said $3,400.00 from said bank, Deer was indebted in a sum stated, and "said $3,400.00 was all the property of any kind that he owned or possessed," at the time of its conversion, except the claims in this suit. The jury made a further finding, that if the law should be with the appellee, he should recover against John R. Teegarden $4,063.00, and against John R. and Hulda Teegarden $4,774.00. The judgment of the court was against the appellants jointly for $4,774.00, and against John R. Teegarden for $4,063.00.

Upon the conclusion reached, in the original opinion, neither of these sums was recoverable under the second paragraph of complaint, and the verdict for all purposes should be treated as not containing the findings that Urial Deer was of "unsound mind." The findings, that the appellants converted said sums to their own use, were conclusions, and had no proper place in the verdict. *Louisville, etc., R. R. Co.* v. *Balch,* 105 Ind. 93.

With relation to the findings as to the $3,400.00, we think it appears, with reasonable certainty, that it was the property of Deer; that it was, as such, obtained by John R. Teegarden and retained by him. This, we think, is true, whether we regard the finding of an agency as a conclusion or the statement of a fact. The finding, in this respect, is supportable upon the first paragraph of complaint.

With relation to the finding as to the $3,850.00, they can have no support upon the theory of the first or the second paragraph of complaint, if we are correct in our holding as to the effect of the general finding, that Deer was of unsound mind; and it remains to be determined whether they can be maintained upon the third

paragraph of complaint. As to that sum, the finding is that it was a gift to the appellants, and there is no finding of positive fraud or undue influence. The parties treat the question, as to this sum, with reference to the doctrine of constructive fraud arising from the situation of confidence and dependence on the one side, and advantage on the other side, and we have no doubt it must be disposed of upon that doctrine upon any view of the findings.

The jury seem to have accepted the theory that the burden rested upon the appellants to show that this money was rightfully received by them, and this theory presents the most important element of the present controversy. There can be no doubt of the general rule, that one occupying a fiduciary relation must, when the question is made, establish his right in equity and good conscience to any advantage gained by him from or through his principal, or his principal's business. 8 Am. and Eng. Ency. of Law, p. 847; Pomeroy Eq. Jur., section 956; Bigelow Frauds, p. 278; Tiedman Eq. Jur., section 235; Beach Modern Eq. Jur., section 141. This duty most frequently arises where the relations between the parties are those of attorney and client; principal and agent; trustee and *cestui que trust;* guardian and ward, and the like. But, there can be no doubt, that the sound rule applies, when, from the superiority of one side and the weakness, partial incapacity or dependence of the other, a substantial and apparently unconscionable advantage has been gained. *Ewing* v. *Wilson*, 132 Ind. 223; *Ikerd* v. *Beavers*, 106 Ind. 483; *McCormick* v. *Malin*, 5 Blackf. 509, and authorities cited; *Woodbury* v. *Woodbury*, 141 Mass. 329, S. C. 55 Am. Rep. 479; *Ashmead* v. *Reynolds*, 134 Ind. 139; *Jacox* v. *Jacox*, 40 Mich. 473; *Highberger* v. *Stiffler*, 21 Md. 338; *Crawford* v. *Hoeft*, 58 Mich. 1; *Barnard* v. *Gantz*, 140 N.

Y. 249; *Martin* v. *Martin*, 57 Tenn. 644; *Street* v. *Goss*, 62 Mo. 226; *Hill* v. *Miller*, 50 Kan. 659; *Paddock* v. *Pulsifer*, 43 Kan. 718; *Mott* v. *Mott*, 49 N. J. Eq. 192; *Muzzy* v. *Tompkinson*, 2 Wash. 616; *Fitch* v. *Reiser*, 79 Ia. 34; *Moore* v. *Moore*, 81 Cal. 195; *Boisaubin* v. *Boisaubin*, 27 Atl. Rep. 624; *Green* v. *Roworth*, 113 N. Y. 462; *Allore* v. *Jewel*, 94 U. S 506.

By the findings, as to the sum now in question, Deer, while he was "old, weak, and childish," while he made his home with the appellants, and depended upon them for such home and for personal care and attention, and while he depended upon Teegarden "to go with him and assist him in transacting all of his financial business," he made to said Teegarden and his son-in-law and daughter, a gift of $3,850.00.

There is no finding that he was subject to, or easily influenced by their persuasion; there is no finding that they exercised any persuasion to obtain the gift, nor does it appear, that at the time of making it, he had no other property, nor that he, by making it, dealt unjustly or with inequality with his other children.

The naked question is: Will the relationship existing, together with Deer's infirmities, enforce the presumption of undue influence and cast the burden upon the appellants of showing the absence of such influence?

Counsel for the appellants urge a distinction between the cases, where the ordinary fiduciary relation exists and those where the relation is that of parent and child. That such distinction has recognition in many of the authorities, is without doubt. However, many of the cases cited, last above, involve transactions between parent and child, and the distinction suggested was neither considered nor observed, but the ordinary rule was applied.

In Pomeroy Eq. Jur., vol. 2, section 962, in a chapter upon the subject of constructive fraud, and following a discussion of the rules with reference to advantages gained from the ordinary fiduciary relation, it is said: "Where the parent is aged, infirm, or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyances conferring benefit upon the child may be set aside. Cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity; a gift from a parent to a child is certainly not presumed to be invalid."

In Bigelow on the Law of Fraud, vol. 1, p. 357, under the head of constructive fraud, and after discussing the question of conveyances and gifts by children to parents, where the parental influence may operate upon the hopes or fears of the child, it is said: "The influence which a child may exert over a parent on the other hand, by acts of filial duty and obedience, can never be undue influence. That influence is proper which any person gains over another by acts of pure kindness and attention and by correct conduct. In the case of a gift from a child to a parent, undue influence may be inferred from the relation itself, but never where the gift is from the parent to the child. * * * A parent does not yield obedience to the child further than affection or duty prompts; and it is in accordance with the promptings of nature that parents should make gifts to their children."

In *Beanland* v. *Bradley*, 2 Smale & G. 339, it is said: "There is no rule of this court which prohibits a man, by voluntary deed, from bestowing a benefit upon his son, or his grandson, or his son-in-law, even though only a few days before his death. To provide for his children or grandchildren is, or may be, a necessary duty; and where a father discharges that duty, this

Teegarden *et ux. v.* Lewis, Administrator.

court will not presume fraud. If fraud is alleged, it must be proven in the ordinary way."

In *Wessell* v. *Rathjohn*, 89 N. C. 377, S. C. 45 Am. Rep. 696, a father was in a condition, arising from debility, to make him easily subject to importunity and undue influence, and his child occupied a position affording an opportunity to exercise such influence. In this condition, the father made a deed of conveyance to the child. It was held that undue influence would not be presumed, and in the course of the opinion it was said: "The facts stated are not inconsistent with the entire integrity of the deed, that is, the facts may be true, as stated, and the deed may have been executed in good faith and without the slightest improper act or conduct on the part of the grantee. The facts stated are evidence, not amounting to a presumption, to go to the jury upon a question of *mala fides* when raised. It is not strange or unnatural that a father, feeble in health, of weak mind, and easily influenced by a daughter having opportunity to exercise such influence, should give his daughter a house and lot and execute to her a deed for it. It is natural, that the father should provide for his daughter; this is a proper and orderly thing to be done. It is what the paternal feeling of good men prompts them to do; it is what just men commend and the law tolerates. Why should the law cast suspicion upon such a transaction? When the transaction, the deed, is right in itself, such as the law tolerates and the common sense of men approves as just, reasonable and commendable, and there is the absence of the relations of suspicion founded on motives of policy, no adverse presumption arises; on the contrary, the law presumes such deed or transaction in all respects proper and just until the contrary is made to appear. The burden is on him who alleges the contrary to

prove it. * * * * The relation of parent and child, as to presumption of fraud and the *onus* of proof to rebut the same, in business transactions between them, does not stand upon the same footing as the relation of trustee and *cestui que trust*, guardian and ward, attorney and client, principal and agent, and the like relations; it belongs to a different class of fiduciary relations, in which the presumption is not so strong, nor does it arise under the same circumstances. Besides, the presumption is always against the party having the superior dominant position or control, and this, in the case of parent and child, is that of parent." See also *Jackson* v. *King*, 4 Cowen 207, S. C. 15 Am. Dec. 354; *Saufley* v. *Jackson*, 16 Tex. 579. *Howe* v. *Howe*, 99 Mass. 88; *Wray* v. *Wray*, 32 Ind. 126.

In *Saufley* v. *Jackson, supra*, in speaking of the rule where the ordinary fiduciary relation has been abused, it was said "But it is clear that this rule was never applied, neither unqualified or qualified, to a deed or gift from a parent to a child; and the reverse of such principle has always been sustained; and there is not believed to be a single exception to the principle that a deed from a parent to a child is always regarded with a favorable eye, and every presumption is in favor of its validity."

In our opinion, the distinction contended for must rule the present inquiry. As to Mrs. Teegarden, that she was a daughter who discharged a moral obligation of supplying a home to and caring for the personal needs of her father, who was aged, weak, and childish, is all that can be urged to raise the presumption of undue influence on her part. In addition to a like discharge of obligation, John R. Teegarden went with and assisted Mr. Deer in transacting his financial business.

Teegarden *et ux. v.* Lewis, Administrator.

If the assistance of John R. Teegarden in the business affairs of Mr. Deer raised the fiduciary relation covered by the general rule, it is difficult to see how that fact could taint the gift as to Mrs. Teegarden. But, we apprehend, that more must appear as to both of the appellants. So far as the element of imbecility is concerned, the facts found are hardly sufficient to warrant the conclusion that Deer was an easy prey to the influences of either of the appellants, and there is an absence of any fact authorizing the inference that either of them sought the gift. If there is any strength in the exception to the general rule, it is indispensable that some element of positive fraud shall be found. The conduct of the appellants, with reference to the gift, so far as the facts appear, is not only not objectionable, but it is highly commendable, save only, possibly, in receiving the gift from one mentally weak. Mental weakness alone is not claimed to be sufficient to avoid the gift. Neither the weakness of Deer nor the control of his affairs, as found, can authorize the conclusion that he was under the superior control or equitable guardianship of the appellants. Unless it can be said that he was in a situation that their will could probably be substituted for his, there can be no constructive fraud.

Our cases of *McCormick* v. *Molin, supra; Ewing* v. *Wilson, supra; Ikerd* v. *Beavers, supra,* and *Ashmead* v. *Reynolds, supra,* each involves some element of positive fraud, and in any of these cases the relationship existing between the parties differed from that here existing, in that no moral obligation rested upon the party parting with his property or extending the obligation to the party to be benefited, excepting in the case of *Ewing* v. *Wilson, supra,* and there the deed was from son to father.

The petition for a rehearing is overruled, and the

mandate heretofore entered is, by the court, modified so that the judgment of the circuit court, as against John R. Teegarden alone, is affirmed, and the judgment against John R. Teegarden and Hulda Teegarden jointly is reversed.

### DISSENTING OPINION.

HOWARD, C. J.—I do not think that it was necessary for the jury, in addition to finding that the decedent was of unsound mind, to find anything further on this issue.

When a person has been found to be of unsound mind, the law infers that he is incapable of transacting business. Section 2724, R. S. 1894 (2554, R. S. 1881), provides that every contract, sale or conveyance of any person while of unsound mind shall be void; and section 2726, R. S. 1894 (section 2556, R. S. 1881), of the same statute, excepts persons of unsound mind from those who may make a valid will. And if a person of unsound mind cannot enter into a valid contract, or make a valid will, it is very clear that he cannot make a valid gift. See *Willett* v. *Porter*, 42 Ind. 250; *Schuff* v. *Ransom*, 79 Ind. 458; *Riggs, Admr.*, v. *American, etc., Society*, 84 N. Y. 330.

In *Fiscus* v. *Turner*, 125 Ind. 46, an instruction was approved, in which the jury were told, that if a person was so far deprived of reason that he was no longer capable of understanding and acting with discretion in the ordinary affairs of life, he was insane within the meaning of the law. In other words, that want of capacity to act with discretion in the ordinary affairs of life, is evidence of unsoundness of mind; that unsoundness of mind and an incapacity for the transaction of business are correlative, each implies the other. Unsoundness of mind like drunkenness, is a fact to be found from the evidence.

The complaint and the finding, in this particular case, very closely follow the statute. Sections 2715, 2716, R. S. 1894 (2545 and 2546, R. S. 1881). The statement or complaint required by the statute to be made, is, "that any inhabitant of such county is a person of unsound mind and incapable of managing his own estate." A guardian is to be appointed, "if such jury shall find that such inhabitant is a person of unsound mind." The finding of unsoundness of mind simply, is sufficiently responsive to the complaint.

Believing that the verdict was sufficient, I must dissent from the conclusion reached by the court.